United States District Court
Southern District of Texas
**ENTERED**
April 17, 2017
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RSL Funding, LLC, RSL Special-IV, Ltd. and Marla B. Matz, | § § § | |
| **Plaintiffs** | § § | Case No. 4:17-CV-00126 |
| v. | § § | |
| Daniel P. Morris and Donna M. O'Brien, | § § § | |
| **Defendants** | § § | |

### CORRECTED FINAL JUDGMENT NUNC PRO TUNC

After considering the Motion to Correct Final Judgment Confirming Arbitration Award and Motion to Confirm Arbitrator's Confidentiality Order Clarifying Arbitration Award Confirmed by this Court ("Motion") (Dkt # 10), the Courts GRANTS the Motion in all respects. In accordance with the Federal Arbitration Act, 9 U.S.C. §§ 1-16, ("FAA") and Federal Rule of Civil Procedure 60(a), the Court

ORDERS, ADJUDGES, and DECREES that the Amended Final Arbitration Award dated December 30, 2016 and the Confidentiality Order dated April 12, 2017 (both attached hereto and incorporated herein for all purposes) are hereby CONFIRMED in their entirety against the Defendants under the FAA and are MERGED into this final judgment nunc pro tunc.

The Court FURTHER ORDERS, ADJUDGES, and DECREES that the Amended Final Arbitration Award dated December 30, 2016 and the Confidentiality Order dated April 12, 2017 are to be read and construed together for all purposes as part of this final judgment nunc pro tunc .

This is a CORRECTED FINAL JUDGMENT NUNC PRO TUNC that resolves all matters involving all parties to this action to confirm an arbitration award under the FAA. All execution may issue to enforce this final judgment nunc pro tunc.

It is so ordered.

SIGNED on _____*apr 17*_____, 2017.

_____
UNITED STATES DISTRICT JUDGE

IN THE MATTER OF THE ARBITRATION BETWEEN

|  |  |  |
|---|---|---|
| | § | |
| | § | |
| *RSL Funding, LLC, RSL Special-IV, Ltd.,* | § | In Arbitration Administered By |
| *and Marla B. Matz,* | § | |
| *Claimants* | § | |
| | § | |
| *and* | § | Conflict Resolution Solutions, PLLC |
| | § | |
| *Cheveze D. Pippins, Daniel P. Morris* | § | |
| *and Donna M. O'Brien,* | § | |
| *Respondents* | § | Before Chris A. Stacy, Arbitrator |
| | § | |

## ORDER

At the Claimants' request, the Arbitrator issues this order to clarify and confirm the confidentiality of the proceedings that resulted in the December 30, 2016 Amended Final Arbitration Award ("Final Award"). Section 154.073(a) of the Texas Civil Practice & Remedies Code mandates that "a communication relating to the subject matter of any civil dispute made by a participant in an alternative dispute resolution procedure, whether before or after the institution of formal judicial proceedings, is confidential, is not subject to disclosure, and may not be used as evidence against the participant in any judicial or administrative proceeding."

Implementing this statutory mandate of confidentiality and in furtherance thereof, the Arbitrator hereby ORDERS that the communications and written materials sent and/or received by the participants in and to the arbitration proceedings made the basis of the Final Award, including those involving the Arbitrator, shall be sealed and shall not become part of the public record. The participants in the arbitration and their agents and assigns are prohibited from disclosing any part of these proceedings, including the

EXHIBIT 1

communications that took place among the Claimants and Respondents, and among any of the parties and the Arbitrator, to any person, entity, or body not a party to these proceedings, except upon order of this Arbitrator with a showing of good cause or upon order of a court of competent jurisdiction.

The Arbitrator FURTHER ORDERS that no matter or communication from this arbitration proceeding may be used or offered as evidence against one of the participants hereto in any judicial or administrative proceeding except upon order of this Arbitrator with a showing of good cause or upon order of a court of competent jurisdiction.

Signed this 12ᵗʰ day of April, 2017.

_____
Chris A. Stacy, ARBITRATOR

IN THE MATTER OF THE ARBITRATION BETWEEN

| | | |
|---|---|---|
| *RSL Funding, LLC, RSL Special-IV, Ltd.,* | § | In Arbitration Administered By |
| *and Marla B. Matz,* | § | |
| | § | |
| *Claimants* | § | |
| | § | Conflict Resolution Solutions, PLLC |
| *and* | § | |
| | § | |
| *Cheveze D. Pippins, Daniel P. Morris and* | § | |
| *Donna M. O'Brien,* | § | Before Chris A. Stacy, Arbitrator |
| | § | |
| *Respondents* | § | |

## DECEMBER 30, 2016 AMENDED FINAL ARBITRATION AWARD

Came on to be heard the arbitration between RSL Funding, LLC ("RSL"), RSL Special-IV, Ltd. ("RSL Special-IV"), and Marla B. Matz ("Matz") (collectively "Claimants") and Respondents Cheveze D. Pippins ("Pippins"), Daniel P. Morris ("Morris"), and Donna M. O'Brien n/k/a Donna Glynn ("O'Brien") (collectively, "Respondents") before Chris A. Stacy as arbitrator. Arbitrator Chris A. Stacy was appointed by Conflict Resolution Solutions, PLLC, a recognized, neutral arbitral association, and accepted such appointment.

### BACKGROUND, JURISDICTION & FINAL HEARING

Claimants initiated this arbitration on September 1, 2016, by filing their written demand for arbitration with Conflict Resolution Solutions, PLLC, which appointed Chris A. Stacy as Arbitrator. The arbitration centers on agreements whereby Pippins, Morris, and O'Brien sold their ownership rights in and the rights to payment under and all ancillary rights to non-ERISA qualified annuities, thereby conveying a full ownership interest in the annuities to RSL Special-IV ultimately for the benefit of Matz. Pippins, Morris, and O'Brien further sold, assigned, and conveyed to RSL and RSL Special-IV all of their rights to receive specific future payments to be made by an annuity company that operates as part of the MetLife family, as more fully set out below. Claimants asserted claims for breach of contract, breach of warranty, conversion, and for declaratory relief, also seeking to recover their attorney's fees as authorized by Texas law.

The Arbitrator finds that RSL and the Respondents entered into multiple arbitration agreements to arbitrate with each other under the Federal Arbitration Act ("FAA"), which came into full force and effect upon the execution of the documents as described herein. Interpreting the arbitration agreements, the Arbitrator concludes that he derives his authority to resolve not only the substantive merits of the parties' dispute, but also all procedural issues that affect these proceedings. No party challenges the execution of these arbitration agreements, their wording, or their effect. RSL and the Respondents clearly and unmistakably agreed to delegate the gateway issue of arbitrability to the Arbitrator. All of the Respondents contractually agreed to arbitration

Exhibit 3   EXHIBIT 2

and thus submitted to the Arbitrator's jurisdiction, and all have participated in the arbitration proceedings as they saw fit. The Arbitrator duly provided disclosures to all of the parties, and no one objected to his qualifications.

Each of the Respondents refused in writing to pay any part of the $10,000.00 initial deposit required by the Arbitrator and due on September 8, 2016. *See* AAA COMM. ARB. RULE R-57. In an email of September 16, 2016, and again in the Scheduling Order that issued on September 23, 2016, the Arbitrator advised the Respondents of the possible consequences of such refusal to pay under AAA Rule R-57. Notwithstanding this refusal to pay, Respondents were allowed to respond to Claimants' demand for arbitration, participate fully in discovery, and participate fully in all hearings and proceedings, including the final hearing on December 8th if they wished. All communications from Respondents and their answers and responses to Claimants' demands were given due consideration in the Arbitrator's decision, and Respondents were allowed to present any and all defenses they wished to Claimants' claims. Respondents were not represented by counsel and so were not required to present defenses via any particular form or protocol. Failure to pay was not a bar to the presentation or consideration by the Arbitrator of any defense advanced by Respondents.

Notwithstanding their status as non-signatories to the arbitration agreements referred to above and at issue in this matter, as assignees of RSL, Matz and RSL Special-IV voluntarily submitted to the Arbitrator's jurisdiction under the same contractual agreements that bind RSL and Respondents. Therefore, Matz and RSL Special-IV are parties to this arbitration to the same extent as RSL.

The final hearing took place in Houston, Texas at the Arbitrator's offices on December 8, 2016, under the Expedited Rules promulgated by the American Arbitration Association ("AAA") per the parties' agreements. As confirmed by the Scheduling Order that issued on September 23, 2016, the Arbitrator applied the AAA's Commercial Arbitration Rules. The Claimants were represented by Mr. John Gorman and Mr. David Brininger of The Feldman Law Firm LLP, of Houston, Texas. The Respondents each received due notice of all filings and proceedings; each filed responses to Claimants' demand for arbitration; each filed responses to Claimants' discovery requests; and each communicated their thoughts freely throughout the proceedings with the Arbitrator; but all wholly failed to appear at the final hearing on December 8th.

At the final hearing on December 8th Mr. Stewart Feldman testified on behalf of Claimants and Mr. Gorman testified as to attorney's fees, further evidence of which the Claimants submitted after the hearing by affidavit. At the final hearing Claimants offered into evidence and the Arbitrator admitted Claimants' Final Arbitration Exhibits numbers 1-66, copies of which were previously provided to Respondents and the Arbitrator by email (1) prior to the final hearing and (2) before the deadline established in the applicable scheduling order and (3) to the email addresses used by Respondents in their communications to the Arbitrator and parties. All references to exhibits below are referring to exhibits from Claimants' Final Arbitration Exhibits. Additional exhibits and an attorney fee affidavit were presented by Claimants at the final hearing or afterwards, which corroborated the testimony adduced at the final hearing.

At the commencement of the final hearing the Arbitrator made the preliminary orders set out below, and then at the conclusion of the final hearing the Arbitrator made the findings of fact set out below.

## PRELIMINARY ORDERS:

1. Claimants' motion to deem admitted the requests for admissions propounded to Chavez Pippins for failure to respond by the deadline is DENIED. The answers given by Chavez Pippins to Claimants' requests for admissions will be admitted and considered, and will receive due consideration in the arbitrator's award.

2. Claimants' motion for default against the Respondents for failure to appear after notice is DENIED. The arbitrator's Amended Scheduling Order was duly sent to all parties and counsel and Respondents made no appearance at the December 8, 2016 Final Hearing, but there will be no default or striking of any answers or responses, and all correspondence received from Respondents will be given due consideration in the arbitrator's award.

### ARBITRATOR'S FINDINGS AND CONCLUSIONS

Upon reviewing the evidence admitted at the final hearing, the Arbitrator finds the following facts to be true and draws the following legal conclusions. The findings and conclusions encompass all disputes that exist between Claimants and Respondents and resolve all the pending claims and the rights of the parties as framed by these proceedings. This Award deems any finding of fact that reflects a legal conclusion to be a legal conclusion, and any legal conclusion that reflects a fact finding to be a finding of fact. The Arbitrator draws on the arbitration agreements, contract law, tort law, common law, statutory law, equity, and AAA Rule R-47 in fashioning the remedies and relief granted by this Award. *See* AAA COMM. ARB. RULES R-47.

At the final hearing Claimants offered into evidence and the Arbitrator admitted Claimants' Final Arbitration Exhibits numbers 1-66, copies of which were previously provided to Respondents and the Arbitrator by email (1) prior to the final hearing and (2) before the deadline established in the applicable scheduling order and (3) to the email addresses used by Respondents in their communications to the Arbitrator and parties. All references to exhibits below are referring to exhibits from Claimants' Final Arbitration Exhibits. An index of Claimants' Final Arbitration Exhibits is attached hereto as Exhibit A.

## FINDINGS OF FACT:

1. RSL Funding LLC ("RSL") markets to persons selling annuities and other such deferred payment streams from consumers who own such products and who want to sell them for immediate cash.

2. The products at issue in this arbitration were annuities owned outright by the Respondents (vs structured settlements where a 3rd party owns the fund and there is a payee beneficiary).

3.  The annuities at issue in this arbitration include the following:
    a.  The "O'Brien/Glynn annuity #1" (See Ex. C-4, C-7 and C-8): a short term annuity that was purchased from and paid by Metropolitan Life Insurance Company, which has now been paid out in full and the money is in the registry of the court (approximately $50,000 for both the O'Brien/Glynn annuity #1 and the O'Brien/Glynn annuity #2 referenced below).
    b.  The "O'Brien/Glynn annuity #2" (See Ex. C-4, C-7 and C-8: a short term annuity that was purchased from and paid by Metropolitan Life Insurance Company, and which has now been paid out in full and the money is in the registry of the Harris County Civil Court at Law (the "County Court").
    c.  The "Chavez Pippin annuity" (See Ex. C-1, C-15 and C-16): In approximately April, 1992, Chavez Pippin became the owner (and payee) of this annuity from Metropolitan Life Insurance Company of Connecticut (formerly Travelers). RSL bought the last 15 months of the guaranteed payments and 165 of the remaining life contingent payments of this annuity (without the benefit of medical analysis on Chavez Pippin). As of the date of the Final Hearing there is approximately $22,000 in the County Court's registry now, and Claimants' anticipate there will be approximately $35,000 in additional payments into the Court's registry in the future in connection with this annuity.
    d.  The "Dan Morris annuity" (See Ex. C-2, C-9 and C-10): Approximately March, 2008, Dan Morris became the owner and payee of this annuity from Met Life Investors USA Insurance Company. RSL bought the guaranteed payments from March, 2011 through March, 2028, of which there is approximately $28,000 in the Court's registry now, with an approximately $65,000 in additional payments to be made into the County Court's registry in the future.
4.  After Claimants acquired the annuities MetLife refused to pay or change its records to reflect RSL as the new owner. Thereupon Claimants sued all three MetLife annuity companies referred to above and all three annuitants (Respondents herein) in the County Civil Court at Law in Harris County, Texas, to enforce Claimants' rights herein.
5.  In the summer of 2011, at the approximate age of 22, and after having already sold his annuity to RSL, Chavez Pippin tried to sell his annuity to 3rd party Peachtree (See Ex 4 to the deposition of the MetLife corporate representative, Ex C-23; see also Chavez Pippin's admission in his deposition, C-34).
6.  In August or September, 2011, Dan Morris tried to sell his annuity to third-party Woodbridge (See Ex. C-38, at pages 234-240).
7.  Upon discovering Mr. Pippin's efforts to sell to Peachtree, and because such action on his part created an arbitral dispute under the broad arbitration provisions of the agreement between RSL and Mr. Pippin, Claimants moved to compel Chavez Pippins to arbitration to stop him from going forward with such sale. The Arbitrator finds that the arbitration agreement between RSL and Mr. Pippin is broad and that such behavior by Mr. Pippin created an arbitral dispute thereunder.
8.  MetLife refused to allow Pippins to sell to Peachtree (see the phone logs in the exhibit).

9. Respondents filed a counterclaim in the County Court suit referenced above, which was the origin of an arbitral dispute with the other Respondents besides Mr. Pippin.

10. MetLife filed an interpleader in the County Court suit and began making the annuity payments at issue into the registry of the County Court.

11. Claimants' claims and Respondents' claims in the County Court suit were nonsuited because of concerns over the court's jurisdictional limits, leaving the MetLife interpleader on file and the money in the County Court registry. MetLife has continued making all the annuity payments into the County Court registry.

12. On December 1, 2011, Respondents filed a suit in Harris County District Court against Claimants and MetLife which was stayed and is still pending.

13. On January 30, 2012, Respondents tried to withdraw the funds from the County Court registry with the assistance of their attorney Mr. Seth Kretzer. To the extent one did not already exist, this behavior created an arbitrable dispute between RSL and the Respondents. Accordingly Claimants filed a demand for arbitration on February 16, 2012, and a motion to stay the County Court case pending arbitration. Claimants' motion was denied (Ex 65), on the basis that Claimants had waived the right to arbitrate.

14. Then on March 16, 2012, Respondents moved to stay the arbitration, and on March 30, 2012, the County Court signed an order staying the arbitration. Claimants then appealed that order to the Court of Appeals, and on April 17, 2012 the Court of Appeals stayed the County Court case.

15. At that point Respondents Morris and Pippins sent letters to the Court of Appeals asking the appellate court to order the County Court to release the funds from the County Court registry (Ex 66 and 67).

16. The Court of Appeals then affirmed the County Court order staying the arbitration, but the Supreme Court then reversed the Court of Appeals on the issue of arbitrability and ruled in favor of Claimants, and at long last the arbitration is proceeding.

17. There is no genuine dispute over the Claimants' ownership rights to the annuities (see Ex. C-63, 64, and Respondents' answers to requests for admissions), and the Arbitrator finds that the annuities and all present and future rights related thereto belong to Claimants as more fully stated below.

18. Regarding the assignability of the annuities, the Arbitrator makes the following findings:

    A. MetLife has agreed to this arrangement previously, with RSL and others like RSL in this industry. See C-2, p. 3. Mr. Feldman testified that the proper forms were filled out in this case by Respondents (see Ex 6 to Ex C-23, the deposition of the MetLife representative, with an exemplar form).

    B. The language in question is different for each annuity:

        a. There is "Protection of Proceeds" language in the Morris annuity (C-2, p 2 near the end of the C-2).

        b. See p 96 of C-23, the MetLife corporate representative's deposition.

        c. The Pippin annuity says the assignment cannot be pledged as collateral, but expresses no prohibition against assignment of the ownership or beneficiary rights.

      d. The O'Brien annuity language (C-4, both annuities, about 5 pages in) specifically says the owner can be changed at any time.

    C. The MetLife agent testified at Ex. C-23, p. 124-125, that Morris could sell the payments or the contract.

    D. In Ex C-46, counsel for MetLife agreed to honor the assignment to Claimants in exchange for a release of all claims, so clearly the MetLife companies had the right to honor the assignments should they chose to do so.

19. Previously MetLife had offered to honor the assignments if RSL would be a revocable payee (which would render MetLife's obligations as payor and RSL's rights as assignee largely illusory); thereafter MetLife imposed additional extra-contractual conditions before honoring the assignments; and finally MetLife demanded a release before honoring the assignments (in spite of a continued fight between Claimants and MetLife over costs and fees); but never did any of the MetLife companies unconditionally offer an irrevocable agreement to honor the assignments, and the evidence reflects that the MetLife companies always sought to impose extra-contractual conditions to Claimants' detriment before agreeing to honor the assignments.

20. Claimants had no obligation to accept this conduct and/or breach by MetLife of its obligations to Respondents and then to Claimants under the contracts in question. The Respondents and/or Claimants probably have a claim against MetLife in connection with the conduct described herein by the agents of the various MetLife companies in connection with the assignability of these annuities.

## ADDITIONAL FINDINGS REGARDING CHEVEZE D. PIPPINS

Respondent Cheveze D. Pippins does not dispute that he entered into **four** separate arbitration agreements with RSL as special servicing agent for RSL Special-IV in connection with his sale of ownership rights in and/or monthly payments due under an annuity he owned. These arbitration provisions appear in agreements by which Pippins transferred ownership of his annuity to RSL Special-IV and the payment rights thereunder to RSL and RSL Special-IV. Matz, a natural person is the assignee of RSL Special-IV and she holds the ultimate rights to that which was acquired for all three annuities.

The annuity sold by Pippins generates taxable periodic payments, thereby making it not subject to any state's Structured Settlement Protection Act ("SSPA") which is therefore inapplicable. In other words, the annuity payments do not qualify as structured settlement payments that fall under the SSPA. Thus, no prior court approval was needed for Pippins to assign the annuity contract and his payment rights to RSL and RSL Special-IV.

MetLife Insurance Company of Connecticut ("MLICC") issued Annuity Contract No. 828742789 to Pippins ("Pippins Annuity"). The Pippins Annuity designated Pippins as "Owner" and "Annuitant," originally vesting him with all rights of ownership and all right, title, and interest in and to the annuity payments. In contracts with RSL and RSL Special-IV, Pippins changed the ownership of the Pippins Annuity to RSL Special-IV and granted RSL Special-IV ownership rights to the annuity payments due thereunder. Specifically, the Assignment

Agreement signed by Pippins conveyed all right, title, and interest to certain annuity payments payable under the Pippins Annuity to RSL and ultimately by assignment to RSL Special-IV ("Pippins Agreement"). An Agreement and Bill of Sale signed by Pippins irrevocably granted, assigned, conveyed, transferred and delivered to RSL Special-IV all of his right, title, and interest in the Pippins Annuity and the payments thereunder ("Pippins Bill of Sale"). As noted above, Claimant Matz obtained her rights of ownership in the Pippins Annuity and the payments thereunder from RSL Special-IV.

The Pippins Agreement with RSL dated June 4, 2011 took effect of its own accord upon execution by the parties without any need for court approval under the SSPA. The Pippins Bill of Sale likewise took effect of its own accord without any need for court approval under the SSPA. By virtue of those agreements with RSL *et al.*, Pippins conveyed all of his ownership rights in the Pippins Annuity and his rights to receive the scheduled annuity payments thereunder. Pippins further entered into two different promissory notes he signed in favor of RSL as lender, dated November 15, 2011 and December 15, 2011, by which he received cash advances from RSL none of which were required under the contract. Such were made by RSL to assist Pippins.

Based upon the evidence, the Arbitrator finds as to Pippin, at a minimum, the following:

1) Pippins entered into the agreements described above and herein;

2) Pippins transferred payment and ownership rights to RSL and RSL Special-IV by and through the agreements of the parties;

3) Pippins made several warranties related to the agreements, including that he would transfer ownership of the Pippins Annuity to RSL and RSL Special-IV;

4) Pippins attempted to convert the Pippins Annuity as described below; and,

5) Pippins breached the agreements with RSL and RSL Special-IV and to causing Claimants damages as described below.

In construing all of the documents at issue and in deciding the Parties' dispute, the Arbitrator finds that RSL Special-IV is the owner and/or co-owner of the Pippins Annuity, thereby entitling RSL Special-IV to any and all monies on deposit in the registry of the Harris County Court. In particular, the Arbitrator construes the Pippins Agreement to provide that RSL assigned to RSL Special-IV all of the rights, title, and interest RSL acquired from Pippins in and to the annuity payments, effective immediately. The Arbitrator construes the Pippins Bill of Sale to vest RSL Special-IV with ownership rights in and to the Pippins Annuity to the extent of all of the payment rights Pippins sold. The Arbitrator further finds that Pippins has established no meritorious defenses to all of the ownership and payment rights held by RSL Special-IV, which in turn assigned all of its right, title, and interest to Matz.

In construing all of the documents at issue and in deciding the Parties' dispute, the Arbitrator finds that nothing in the Pippins Annuity ever precluded Pippins from transferring ownership and payment rights in and to the Pippins Annuity to RSL and RSL Special-IV as set forth in the

Pippins Agreement and the Pippins Bill of Sale. The Arbitrator concludes that the language in the Pippins Annuity stating that, "The Agreement cannot be collaterally assigned," merely "means to assign property as collateral security for a loan," and therefore lacks any application to this transaction whereby Pippins voluntarily changed ownership of the Pippins Annuity and sold the rights to certain annuity payments due thereunder. *See Coffey v. Singer Asset Fin. Co., LLC*, 223 S.W.3d 559, 566 (Tex. App. – Dallas 2007, pet. denied) (quoting BLACK'S LAW DICTIONARY 128 (8th ed. 2004)). The relevant language found in the documents that comprise the Pippins Annuity and the testimony and behavior of the various MetLife agents set out above all support Pippins' right to transfer ownership, and Pippins personally is estopped from claiming otherwise based on the facts and findings set out herein.

Respondent Pippins breached his contracts with Claimants by failing to comply with or carry out obligations in, among other things, the Pippins Agreement, the Promissory Notes, the Application, and the Pippins Bill of Sale. The material breaches of contract continue to occur. Pippins materially breached his contract by, for example, attempting to secretly sell to another company, Peachtree, being the same income payments he had already sold to RSL and RSL Special-IV and for which Pippins had received all compensation then due him. Nor did Pippins fully cooperate with RSL and RSL Special-IV in completing the purchase-and-sale transaction with those parties to their satisfaction.

Pippins additionally breached his contracts with RSL by refusing to arbitrate this dispute and by affirmatively opposing or resisting arbitration, including seeking and obtaining a stay of the original arbitration initiated by RSL in February 2012. By refusing to arbitrate or cooperate fully with RSL when this dispute first arose and all through the appellate proceedings that lasted from April 2012 to September 23, 2016 (when the mandate issued), Respondent Pippins failed to comply with and breached material provisions of the arbitration agreements. This behavior greatly magnified the cost and expense to Claimants herein.

The Arbitrator further finds that as to the Pippin Annuity and the annuity payments due thereunder, RSL *et al.* gave MLICC proper notice of the change in ownership of such and that Pippins also gave MLICC proper and timely notice that ownership of the Pippins Annuity had changed and that MLICC should direct the payments at issue to RSL or its assignee RSL Special-IV for the benefit of Matz. The evidence before the Arbitrator establishes that Pippins never succeeded in having MLICC recognize RSL *et al.* as the owner or co-owner of the Pippins Annuity, in large part due to Pippins trying to secretly double sell his payments to others and then to oppose arbitration, seeking to back out of his contract in court, and then attempting to withdraw funds from the registry which belonged to the Claimants. Pippins and the other Respondents' actions conducted in unison caused many of problems that created this extended legal dispute.

Respondent Pippins also attempted to convert and impair Claimants' property rights in and to the Pippins Annuity and the identifiable stream of cash payments it generates, as well as the security interest he granted in those payments. Claimants have obtained neither ownership of the Pippins Annuity nor the stream of income payable under them from Pippins as promised, warranted, and represented in the Pippins Agreement and in the Pippins Bill of Sale. Nor has Pippins succeeded in directing MLICC to turn over ownership of the Pippins Annuity and the

payments thereunder to RSL or its assignees as promised, warranted, and represented in the Pippins Agreement, in the Pippins Bill of Sale, and elsewhere. Rather, Pippins did the opposite in asserting wrongful and unauthorized dominion or control over the monies payable by the Pippins Annuities contrary to his agreements with RSL *et al.*

### ADDITIONAL FINDINGS REGARDING DONNA M. O'BRIEN (N/K/A DONNA GLYNN)

Respondent Donna M. O'Brien does not dispute that she entered into **four** separate arbitration agreements with RSL in connection with her sale of ownership rights and monthly payments due under two annuities she owned. Metropolitan Life Insurance Company ("MLIC") serves as O'Brien's annuity issuer for Contract No. 550191389, Contract No. 550195184, Supplementary Contract No. 000855260RB, and Supplementary Contract No. 000855262RB (the "O'Brien Annuities"). The O'Brien Annuities designated O'Brien as "Owner" and "Annuitant," originally vesting her with all rights of ownership and all right, title, and interest in and to the annuity payments. The O'Brien Annuities define the key term **"Owner"** as "The person(s) entitled to the ownership rights under this Contract."

In contracts with RSL and RSL Special-IV, O'Brien changed the ownership of the O'Brien Annuities to RSL Special-IV and granted RSL Special-IV ownership rights to the annuity payments due thereunder. In construing the Assignment Agreement dated December 6, 2010, the Arbitrator concludes that O'Brien conveyed all right, title, and interest in and to the O'Brien Annuities to RSL and ultimately by assignment to RSL Special-IV ("O'Brien Agreement"). An Agreement and Bill of Sale signed by O'Brien ("O'Brien Bill of Sale") irrevocably granted, assigned, conveyed, transferred and delivered to RSL Special-IV all of her right, title, and interest in the O'Brien Annuities and the payments thereunder. Claimant Matz subsequently obtained her rights of ownership in the O'Brien Annuities and the payments thereunder by assignment from RSL Special-IV.

The O'Brien Agreement with RSL dated December 6, 2010 took effect of its own accord upon execution by the parties without any need for court approval under the SSPA which has no applicability to the transactions at hand. The O'Brien Bill of Sale likewise took effect of its own accord without any need for court approval under the SSPA. By virtue of those agreements with RSL, *et al.*, O'Brien conveyed all of her ownership rights in the O'Brien Annuities and her rights to receive the scheduled annuity payments thereunder. O'Brien further entered into two different promissory notes she signed in favor of RSL as lender, dated December 1, 2011 and December 22, 2011, by which she received cash advances from RSL.

Claimants served Respondent O'Brien with requests for admissions on October 10, 2016, in accordance with the deadline set the Scheduling Order. Based on her admissions and the other evidence adduced herein, the Arbitrator finds, among other things, that:

1) O'Brien entered into the agreements described above and herein;

2) O'Brien transferred payment and ownership rights to RSL and RSL Special-IV by and through the agreements of the parties;

3) O'Brien made several warranties related to the agreements, including that she would transfer ownership of the O'Brien Annuities to RSL and RSL Special-IV;

4) O'Brien, despite agreeing to transfer ownership and payment rights, attempted to convert the O'Brien Annuities as described herein, and thereby caused Matz's damages due to the conversion; and,

5) O'Brien's Chapter 7 bankruptcy schedules show that the O'Brien Annuities were transferred to RSL prior to O'Brien filing for bankruptcy.

In construing all of the documents at issue and in deciding the Parties' dispute, the Arbitrator finds that RSL Special-IV is the owner and/or co-owner of the O'Brien Annuities, thereby entitling RSL Special-IV (for the benefit of Matz) to all present and future rights relating to the O'Brien Annuities. In particular, the Arbitrator construes the O'Brien Agreement to provide that RSL assigned to RSL Special-IV all of the rights, title, and interest RSL acquired from O'Brien in and to the annuity payments, effective December 6, 2010, with Matz being the ultimate beneficiary of the RSL Special-IV rights pursuant to the September 15, 2011 assignment of rights from RSL Special-IV to Matz. The Arbitrator construes the O'Brien Bill of Sale to vest RSL Special-IV with ownership rights in and to the O'Brien Annuities to the extent of all of the payment rights O'Brien sold.

In construing all of the documents at issue and in deciding the Parties' dispute, and in addition to the analysis set out above, the Arbitrator finds that nothing in the O'Brien Annuities ever precluded O'Brien from transferring ownership and payment rights in and to the O'Brien Annuities to RSL and RSL Special-IV as set forth in the O'Brien Agreement and the O'Brien Bill of Sale. Under the heading, "Annuitant, Ownership, Assignment Provisions," the O'Brien Annuities provided O'Brien as the "Owner" with absolute rights, including the unqualified right to change owners:

> Owner
> You, as the Owner, have all the interest and rights under this Contract. The Owner is the person designated on the Contract Schedule, unless changed. You may change the Owner at any time. A request for change must be by Notice and will become effective as of the date the Notice is signed.

Construing this key language, the Arbitrator finds and concludes that this provision embodies the essence of the O'Brien Annuities. Otherwise, the right of ownership in the Annuities would confer no benefit to O'Brien, representing a hollow or illusory promise made by MLIC and creating a repugnant restriction on the right to alienate the Annuity or change its ownership. The Arbitrator instead construes this provision to give it meaning within the context of the entire agreement with MLIC. As it plainly says, the "Owner" provision authorizes O'Brien to "change the Owner at any time." O'Brien changed the "owner" of the O'Brien Annuities to RSL Special-IV and ultimately to Matz, giving proper notice of same to MLIC.

The Arbitrator concludes that the language in the O'Brien Annuities stating that, "After Income Payments start, your Contract may not be assigned," does not constitute a mandatory

prohibition against changing the owner of the Annuities. Unless the "Owner" provision in the O'Brien Annuities retains meaning and vitality, an ambiguity exists that the Arbitrator must construe against the drafter MLIC and, by extension, O'Brien. Nor does this provision even apply to this transaction whereby O'Brien voluntarily changed ownership of the O'Brien Annuities and sold the rights to certain annuity payments due thereunder. O'Brien cannot rely on this inapposite and inapplicable "anti-assignment" language, because the Arbitrator finds that she waived her right to raise such a defense against the Claimants by voluntarily entering into the transaction or is estopped as the seller from doing so by agreeing to enter into the purchase-and-sale transaction with RSL and RSL Special-IV (ultimately for Matz benefit) in the first place. More to the point, O'Brien has admitted to irrevocably selling, conveying, and transferring ownership of the O'Brien Annuities and the payments due under them to RSL *et al.*

Respondent O'Brien breached her contracts with Claimants by failing to comply with or carry out obligations in, among other things, the O'Brien Agreement, the Promissory Notes, the Application, and the O'Brien Bill of Sale, similar to that of Pippins with whom O'Brien cooperated , sharing the same counsel. The material breaches of contract continue to occur. Nor did O'Brien fully cooperate with RSL and RSL Special-IV in completing the purchase-and-sale transaction with those parties to their satisfaction. Instead, O'Brien sought to avoid the contract in court, sought to avoid arbitration, and wrongfully sought to withdraw funds from the registry.

O'Brien additionally breached her contracts with RSL by refusing to arbitrate this dispute and by affirmatively opposing or resisting arbitration, including seeking and obtaining a stay of the original arbitration initiated by RSL in February, 2012. By refusing to arbitrate or cooperate fully with RSL when this dispute first arose and all through the appellate proceedings that lasted from April, 2012 to September 23, 2016 (when the mandate issued), Respondent O'Brien failed to comply with and breached material provisions of the arbitration agreements.

The Arbitrator further finds that RSL, *et al.* gave MLIC proper notice of the change in ownership of the O'Brien Annuities and the annuity payments due thereunder and that O'Brien also gave MLIC proper and timely notice that ownership of the O'Brien Annuities had changed and that MLIC should direct the payments at issue to RSL, *et al.* The evidence before the Arbitrator establishes that O'Brien never succeeded in having MLIC recognize RSL *et al.* as the owner or co-owner of the O'Brien Annuities and in having MLIC make the annuity payments directly to RSL *et al.*

Respondent O'Brien also attempted to convert and impair Claimants' property rights in and to the O'Brien Annuities and the identifiable stream of cash payments they generate, as well as the security interest she granted in those payments. Claimants have obtained neither ownership of the O'Brien Annuities nor the stream of income payable under them from O'Brien as promised, warranted, and represented in the O'Brien Agreement and the O'Brien Bill of Sale. Nor has O'Brien succeeded in directing MLIC to turn over ownership of the O'Brien Annuities and the payments thereunder to RSL or its assignees as promised, warranted, and represented in the O'Brien Agreement, in the O'Brien Bill of Sale, and elsewhere. Rather, O'Brien did the opposite in asserting wrongful and unauthorized dominion or control over the monies payable by the O'Brien Annuities contrary to her agreements with RSL *et al.*

11

As a result of the breach of contract, breach of warranty, and conversion committed by Respondent O'Brien, Claimants suffered actual damages as explained and awarded herein. Out-of-pocket damages likewise resulted from the actions taken by O'Brien and are awarded to Claimants.

O'Brien filed and obtained Chapter 7 bankruptcy relief in New York which resulted in a discharge of debts under 11 U.S.C. § 727 in an order dated October 3, 2013. The Arbitrator has insufficient evidence to determine whether or not any of the obligations at issue herein have been discharged in that Chapter 7 bankruptcy. The evidence before the Arbitrator indicates (1) that O'Brien disclosed in her bankruptcy filings that she had previously assigned, sold and conveyed the O'Brien Annuities and her payment rights under them to the Claimants, and (2) that this assignment occurred pre-bankruptcy, divesting O'Brien of her ownership interest in the O'Brien Annuities and transferring that interest to RSL before the bankruptcy was filed. Based on the facts before him, the Arbitrator finds that O'Brien's bankruptcy filing has no effect on Claimants' rights under the O'Brien Annuities as the Claimants are and were the true owners of the O'Brien Annuities and the payments due thereunder prior to O'Brien's bankruptcy filing. The Arbitrator is unable to make a ruling as to whether any further liability of O'Brien for damages or attorney fees herein was discharged in that bankruptcy in the absence of additional exhibits or testimony relating thereto. It is unknown to the Arbitrator whether the disputes made the basis of this arbitration or its related litigation were scheduled or discharged in the O'Brien bankruptcy, or whether O'Brien's liability for Claimants' damages and fees was otherwise somehow discharged in that bankruptcy, but in any event it seems clear and the Arbitrator hereby rules that Claimants' rights to the funds, proceeds and payments in connection with the O'Brien Annuities accrued prior to the O'Brien bankruptcy so Claimants are entitled to those funds, proceeds and payments, whether past, present or future, as more fully set out below in the Resolution of Claims section herein.

### ADDITIONAL FINDINGS REGARDING DANIEL P. MORRIS

Respondent Daniel P. Morris does not dispute that he entered into **four** separate arbitration agreements with RSL as special servicing agent for RSL Special-IV in connection with his sale of ownership rights in and/or monthly payments due under an annuity he owned. The parties' agreement concerns a garden-variety, taxable annuity that is not governed by a state's Structured Settlement Protection Act ("SSPA"). Thus, no prior court approval needs to occur for Morris to assign the annuity contract and his payment rights to RSL and RSL Special-IV. MetLife Investors USA Insurance Company ("MetLife Investors") issued Annuity Contract No. R9500054809 to Morris ("Morris Annuity"). The Morris Annuity designated Morris as the "Owner" and "Annuitant," originally vesting him with all rights of ownership and all right, title, and interest in and to the annuity payments. The Morris Annuity defines the key term "**Owner**" as "The person(s) entitled to the ownership rights under this Contract."

In contracts with RSL and RSL Special-IV, Morris changed the ownership of the Morris Annuity to RSL Special-IV and granted RSL Special-IV ownership rights to the annuity payments due thereunder. In construing the Assignment Agreement dated January 7, 2011, the Arbitrator concludes that Morris conveyed all right, title, and interest in and to the Morris Annuity to RSL and ultimately by assignment to RSL Special-IV ("Morris Agreement"). An

12

Agreement and Bill of Sale signed by Morris on January 7, 2011 ("Morris Bill of Sale") irrevocably granted, assigned, conveyed, transferred and delivered to RSL Special-IV all of his right, title, and interest in the Morris Annuity and the payments thereunder. Claimant Matz obtained her rights of ownership in the Morris Annuity and the payments thereunder by assignment from RSL Special-IV.

The Morris Agreement with RSL dated January 7, 2011 took effect of its own accord upon execution by the parties without any need for court approval under the SSPA. The Morris Bill of Sale likewise took effect of its own accord without any need for court approval under the SSPA. By virtue of those agreements with RSL *et al.*, Morris conveyed all of his ownership rights in the Morris Annuity and his rights to receive the scheduled annuity payments thereunder. Morris further entered into a promissory note he signed in favor of RSL as lender, dated December 21, 2011, by which he received a cash advance from RSL, as well as an irrevocable assignment of claims dated January 2, 2012, and an addendum to same dated January 30, 2012.

Claimants served Respondent Morris with requests for admissions on October 10, 2016, in accordance with the deadline set the Scheduling Order. Based on Morris' answers and the other evidence set out above and contained in Claimants' Final Hearing Exhibits, the Arbitrator finds as follows:

1) Morris entered into the agreements described above and herein;

2) Morris transferred payment and ownership rights to RSL and RSL Special-IV by and through the agreements of the parties;

3) Morris made several warranties related to the agreements, including that he would transfer ownership of the Morris Annuity to RSL and RSL Special-IV; and,

4) Morris transferred his rights in and to his claims against MetLife as described in the January 30, 2010 Corrected and Restated Addendum to Irrevocable Assignment of Claims.

In construing all of the documents at issue and in deciding the Parties' dispute, the Arbitrator finds that RSL Special-IV is the owner and/or co-owner of the Morris Annuity, thereby entitling RSL Special-IV (and ultimately Matz) to all present and future rights to the thereunder. In particular, the Arbitrator construes the Morris Agreement to provide that RSL assigned to RSL Special-IV all of the rights, title, and interest RSL acquired from Morris in and to the annuity payments, effective immediately. The Arbitrator construes the Morris Bill of Sale to vest RSL Special-IV with ownership rights in and to the Morris Annuity to the extent of all of the payment rights Morris sold. The Arbitrator further finds that RSL Special-IV in turn assigned all of its right, title, and interest to Matz, effective September 15, 2011.

In construing all of the documents at issue and in deciding the Parties' dispute, the Arbitrator finds that nothing in the Morris Annuity ever precluded Morris from transferring ownership and payment rights in and to the Morris Annuity to RSL and RSL Special-IV as set forth in the Morris Agreement and the Morris Bill of Sale. Under the heading, "Annuitant,

Ownership, Assignment Provisions," the Morris Annuity provided Morris as the "Owner" with absolute rights, including the unqualified right to change owners:

Owner

> You, as the Owner, have all the interest and rights under this Contract. The Owner is the person designated on the Contract Schedule, unless changed. You may change the Owner at any time. A request for change must be by Notice and will become effective as of the date the Notice is signed.

Construing this key language, the Arbitrator finds and concludes that this provision embodies the essence of the Morris Annuity. Otherwise, the right of ownership in the Annuity would confer no benefit to Morris, representing a hollow or illusory promise made by MetLife Investors and creating a repugnant restriction on the right to alienate the Morris Annuity or change its ownership. The Arbitrator instead construes this provision to give it meaning within the context of the entire agreement with MetLife Investors. As it plainly says, the "Owner" provision authorizes Morris to "change the Owner at any time." Morris changed the "owner" of the Morris Annuity to RSL Special-IV and ultimately to Matz, giving proper notice of same to MetLife Investors.

The Arbitrator concludes that the language in the Morris Annuity stating that, "The Contract and the Income Payments under it are not assignable and will be exempt from the claims of creditors to the extent permitted by law," does not constitute a mandatory prohibition against changing the owner of the Annuities. Unless the "Owner" provision in the Morris Annuity retains meaning and vitality, an ambiguity exists that the Arbitrator must construe against the drafter MetLife Investors and, by extension, Morris. Nor does this provision even apply to this transaction whereby Morris voluntarily changed ownership of the Morris Annuity and sold the rights to certain annuity payments due thereunder.

Respondent Morris breached his contracts with Claimants by failing to comply with or carry out obligations in, among other things, the Morris Agreement, the Promissory Note, the Application, and the Morris Bill of Sale. The material breaches of contract continue to occur. For example, Morris materially breached his contract by, for example, attempting to sell to Peachtree the same income payments he had already sold to RSL and RSL Special-IV. Nor did Morris fully cooperate with RSL and RSL Special-IV in completing the purchase-and-sale transaction with those parties to their satisfaction.

Morris additionally breached his contracts with RSL by refusing to arbitrate this dispute and by affirmatively opposing or resisting arbitration, including seeking and obtaining a stay of the original arbitration initiated by RSL in February 2012. By refusing to arbitrate or cooperate fully with RSL when this dispute first arose and all through the appellate proceedings that lasted from April, 2012 to September 23, 2016 (when the mandate issued), Respondent Morris failed to comply with and breached material provisions of the arbitration agreements.

The Arbitrator further finds that RSL *et al.* gave MetLife Investors proper notice of the change in ownership of the Morris Annuity and the annuity payments due thereunder and that

Morris also gave MetLife Investors proper and timely notice that ownership of the Morris Annuity had changed and that MetLife Investors should direct the payments at issue to RSL *et al.* The evidence before the Arbitrator establishes that Morris never succeeded in having MetLife Investors recognize RSL *et al.* as the owner or co-owner of the Morris Annuity and in having MetLife Investors make the annuity payments directly to RSL *et al.*

Respondent Morris also attempted to convert and impair Claimants' property rights in and to the Morris Annuity and the identifiable stream of cash payments it generates, as well as the security interest he granted in those payments. Claimants have obtained neither ownership of the Morris Annuity nor the stream of income payable under that annuity from Morris as promised, warranted, and represented in the Morris Agreement and the Morris Bill of Sale. Nor has Morris succeeded in directing MetLife Investors to turn over ownership of the Morris Annuity and the payments thereunder to RSL or its assignees as promised, warranted, and represented in the Morris Agreement, in the Morris Bill of Sale, and elsewhere. Rather, Morris did the opposite in asserting wrongful and unauthorized dominion or control over the monies payable by the Morris Annuity contrary to his agreements with RSL *et al.*

### RESOLUTION OF CLAIMS

<u>Respondents' Claims:</u>

Respondents have made no claims in this arbitration and accordingly take nothing. To the extent Respondents feel they are entitled to advance any claim for damages or attorney fees, the Arbitrator concludes it would be inequitable and unjust to award them fees under any statute or common law theory, or under the AAA rules.

<u>Claimants' Claims:</u>

Based on the evidence presented and the findings described herein, the Arbitrator **GRANTS AND RULES IN FAVOR OF** all of the Claimants' claims for breach of contract, breach of warranty, conversion, and declaratory relief in all respects. The Arbitrator **FURTHER AWARDS** Claimants their costs, attorney's fees, and damages as described below.

### AWARD OF DAMAGES, ATTORNEY'S FEES, AND COSTS

1.  ***Breach of contract – Arbitration.*** Respondents breached their agreements to arbitrate, resulting in years of litigation and appeals by RSL before they submitted to arbitration and the Arbitrator's jurisdiction. This includes fighting contradicting positions of the Respondents in the trial court and on appeal. The attorney's fees that accrued during this lengthy period constitute the measure of RSL's damages that compensate for this breach of contract. Had Respondents simply agreed to arbitrate at the outset in accordance with the multiple arbitration agreements they executed, RSL would never have incurred the large attorney's fees in enforcing those provisions and the resulting multi-court litigation. Thus, Respondents are

jointly and severally liable[1] for attorney's fees incurred by Claimants in bringing about this arbitration and subjecting Respondents to the Arbitrator's jurisdiction.

2. ***Breach of Contract – The Annuities.*** Respondents breached their contracts with Claimants resulting in damages to Claimants measured by the benefit of the bargain Claimants lost. The value of the annuities, measured largely by the ownership rights and the payments due under those instruments, constitute actual damages suffered by Claimants.

    a. The lost income streams of income for the annuities are as follows: (1) for the O'Brien Annuities, approximately $49,867.20; (2) for the Morris Annuity, approximately $92,740.44; and (3) for the Pippin Annuity, approximately $58,875.00. Judgment should be rendered in favor of Claimants for these amounts. Because Claimants established their entitlement to these funds the Arbitrator awards the funds on deposit in the County Court's registry to Claimants along with all further or future amounts on deposit arising out of these same annuities or streams of income. As of the date of this Award, the following amounts are in the County Court registry and should be immediately paid to Claimants: (1) for the O'Brien Annuities, approximately $60,256.20 (total for two annuities); (2) for the Morris Annuity, approximately $29,095.04; and (3) for the Pippins Annuity, approximately $22,400.00. Claimants have also proved up their right to recover reasonable and necessary attorney's fees resulting from the breaches of contract committed by Respondents that concern the merits of this dispute and Respondents are jointly and severally liable for those attorney fees.

    b. Claimants shall recover and can immediately withdraw all funds currently on deposit in the County Civil Court at Law No. 4's registry as to each annuitant inclusive of any interest that may ultimately accrue. Additionally, Claimants shall recover all future deposits to be made by the MetLife Parties in the County Civil Court at Law No. 4's registry as to Mr. Morris and Mr. Pippins inclusive of interest that may ultimately accrue.

3. ***Declaratory Relief.*** Based on the evidence and findings herein, Claimants are the prevailing parties under the Uniform Declaratory Judgments Act and are entitled to declaratory relief as described below.

4. ***Attorney Fees.*** Based on the above awards and the contractual and statutory bases for recovery of attorney fees, the Arbitrator finds that Respondents are jointly and severally liable for attorney's fees incurred by Claimants totaling **$392,767.92**, based on the affidavit evidence Claimants' counsel submitted, although this figure seems very small in comparison to the time and effort Claimants have had to expend to obtain rights they should have had all along. This figure is based on the

---

[1] All references to joint and several liability herein assume that there was no discharge of Respondent O'Brien's liability herein in her Chapter 7 bankruptcy proceeding.

following amounts, and if any of these specific amounts are disallowed by law then the remaining valid awards are to be allowed:

a. $139,395.75, representing reasonable and necessary attorney fees the Claimants incurred for bringing this arbitration and seeing it through completion;
b. $3,500.00, representing reasonable and necessary attorney fees Claimants will incur in having this arbitration award confirmed by a court;
c. $222,800.12, representing only a portion of the reasonable and necessary attorney fees Claimants incurred before the filing of this arbitration in connection with activity required to preserve and uphold Claimants' rights to arbitrate this dispute;
d. $11,572.05, representing costs incurred by Claimants before this arbitration in connection with the pre-arbitration proceedings referred to above; and
e. $15,500.00, representing costs incurred by Claimants in connection with the Arbitrator's fee herein, which are to be assessed as costs in any suit to enforce this Final Award.

## OTHER RELIEF

***Declaratory Relief:***

The Arbitrator makes the following declarations concerning the parties' agreements:

1) The June 4, 2011 Pippins Agreement is valid and enforceable effective as of its date;
2) The Bill of Sale between Pippins and Claimants is valid and enforceable and fully effective as of its date;
3) The November 15, 2011 Promissory Note between Pippins and RSL is valid and enforceable;
4) The December 15, 2011 Promissory Note between Pippins and RSL is valid and enforceable;
5) The arbitration agreements between Pippins and Claimants are valid and enforceable;
6) Pippins sold, transferred and conveyed his ownership rights in and to the Pippins Annuity to Claimants as of June 4, 2011;
7) Pippins sold, transferred and conveyed his payment rights in and to the payments due under the Pippins Annuity to Claimants;
8) Pippins warranted he would fully cooperate with Claimants under the contracts but did not and thereby breached the parties' agreements;
9) Pippins agreed to arbitrate all disputes with Claimants;
10) Pippins failed to follow and did breach his agreements with Claimants;

17

11) Pippins breached his warranties;

12) Pippins attempted to convert Claimants property in breach of the contracts;

13) The December 6, 2010 O'Brien Agreement is valid and enforceable as of such date;

14) The Bill of Sale between O'Brien and Claimants is valid and enforceable as of such date;

15) The December 1, 2011 Promissory Note between O'Brien and RSL is valid and enforceable;

16) The December 22, 2011 Promissory Note between O'Brien and RSL is valid and enforceable;

17) The arbitration agreements between O'Brien and Claimants are valid and enforceable;

18) O'Brien sold, transferred and conveyed her ownership rights in and to the O'Brien Annuities to Claimants as of December 6, 2010;

19) O'Brien sold, transferred and conveyed her payment rights in and to the payments due under the O'Brien Annuities to Claimants as of December 6, 2010;

20) O'Brien warrantied she would fully cooperate with Claimants under the contracts;

21) O'Brien agreed to arbitrate all disputes with Claimants;

22) O'Brien failed to follow and did breach her agreements with Claimants;

23) O'Brien breached her warranties;

24) O'Brien attempted to convert Claimants property in breach of the contracts;

25) The January 7, 2011 Morris Agreement is valid and enforceable as of such date;

26) The Bill of Sale between Morris and Claimants is valid and enforceable as of such date;

27) The December 21, 2011 Promissory Note between Morris and RSL is valid and enforceable;

28) The January 1, 2012 Irrevocable Assignment of Claims between Morris and RSL is valid and enforceable;

29) The arbitration agreements between Morris and Claimants are valid and enforceable;

30) Morris sold, transferred and conveyed his ownership rights in and to the Morris Annuity to Claimants as of January 7, 2011;

31) Morris sold, transferred and conveyed his payment rights in and to the payments due under the Morris Annuity to Claimants as of January 7, 2011;

32) Morris warrantied he would fully cooperate with Claimants under the contracts;

33) Morris agreed to arbitrate all disputes with Claimants;

34) Morris failed to follow and did breach his agreements with Claimants;

35) Morris breached his warranties; and,

36) Morris attempted to convert Claimants property in breach of the contracts.

***Assignment of Claims:***

The Arbitrator believes that Respondents are likely unable to pay the damages awarded against them in this arbitration (based in part on October 6, 2016 emails from Respondent Daniel

18

Morris saying as much), and also the Arbitrator notes that Respondent Donna O'Brien has received a discharge in a Chapter 7 bankruptcy which possibly impacts any finding of liability against her in this arbitration. Based on these considerations the Arbitrator hereby makes the following three orders:

1. The Arbitrator awards to and transfers to the Claimants all choate and inchoate rights, asserted and unasserted, known and unknown, of any kind whatsoever, that Respondents may possess and can exercise against Metropolitan Insurance Company of Connecticut, Metropolitan Life Insurance Company, MetLife Investors USA Insurance Company and the MetLife related entities (the "MetLife Parties") arising out of or relating to the annuities at issue and the agreements by and between the parties herein. In so awarding, the Claimants may seek actions in the name and stead of the Respondents, as well as in the Claimants names.

2. The Arbitrator hereby ORDERS Claimants to release Respondents from any further liability herein but only if Respondents contemporaneously assign to the Claimants (1) any and all claims Respondents may have to the funds currently in the County Court registry or any funds which may in the future be paid into the County Court registry, as well as (2) any and all claims Respondents may have against the MetLife Parties arising from the nucleus of fact made the basis of this arbitration. The assignment language must be in a form acceptable to Claimants in their sole discretion, but the release language must fully release Respondents from any further liability herein for the amounts awarded to Claimants in this arbitration, as well as a release for any future claims (but only those which could be advanced by Claimants), whether for damages, prospective damages, contingent damages, attorney fees, or other.  This remedy is the closest remedy the Arbitrator can fashion which accommodates the desires of the parties as expressed in their communications; it is the most realistic; and it directs the dispute away from Respondents and toward MetLife, where the Arbitrator feels it should be directed.  Should Respondents now fail to comply with such assignment (after having expressly asked for similar relief in their correspondence to the Arbitrator), then Claimants shall have no further obligation to release Respondents, the Arbitrator's award herein can be reduced to judgment against Respondents, execution can issue, and Claimants can collect from Respondents such elements of this arbitration award as the law will allow.

3. Notwithstanding any of the release provisions of paragraph 2 above, the Claimants are not required to release any claims, causes of action, theories of recovery, or defenses against any of the MetLife parties (or any of their affiliates) that may be possessed by any of the Claimants or Respondents.

This is a Final Award resolving all issues, dispute, claims and defenses raised or could have been raised between by any party herein against any other party in relation to the annuity contracts, transfer agreements, transfer of payment rights, transfer of ownership rights, bills of

sale, or promissory notes at issue. All relief not expressly granted is hereby denied. Any portion of this Award not found to be fully enforceable shall not affect the enforcement of any or all other portions of this Award, whose provisions shall be severable. The Arbitrator retains jurisdiction to clarify any aspect of this Amended Final Award in accordance with the Federal Arbitration Act and any other applicable law. This order is final.

This Amended Final Arbitration Award is dated December 30, 2016.

*Chris Stacy*
_____
Chris Stacy, Arbitrator